**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| EXACT SCIENCES CORPORATION, and EXACT SCIENCES LABORATORIES, LLC | ) ) ) ) | |
| Plaintiffs, | ) ) | 1:16CV125 |
| v. | ) ) | |
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Exact Sciences Corporation ("Exact Sciences") and Exact Sciences Laboratories, LLC ("Exact Labs") (collectively referred to as "Exact") have sued Defendant Blue Cross and Blue Shield of North Carolina ("BCBS-NC") for BCBS-NC's alleged failure to pay Exact for the performance of its proprietary colorectal cancer screening test on BCBS-NC Subscribers and have asserted fourteen claims stemming from this alleged failure to pay. (See generally Am. Compl. [Doc. #16].) BCBS-NC has moved to dismiss the entire Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. #21]. For the reasons explained below, the motion is granted in part and denied in part. It is granted as to Counts 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, and 14. It is denied as to Counts 1, 3, and 7.

For purposes of evaluating a motion to dismiss, well-pled facts are accepted as true and construed in the light most favorable to Exact. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).  Exact Sciences, along with researchers at the Mayo Clinic, developed Cologuard®, a non-invasive colorectal cancer stool DNA ("sDNA") screening examination. (Am. Compl. ¶¶ 17, 20.)  It is a proprietary test provided by and exclusively processed at Exact Labs. (Id. ¶ 29.)

Cologuard®, the only multi-target sDNA screening test for colorectal cancer, uses advanced sDNA technology to find elevated levels of altered DNA in abnormal cells that have been shed from the lining of the colon and picked up by stool passing through the colon. (Id. ¶¶ 18, 19, 28.)  Cologuard® also uses a fecal immunochemical test to find elevated levels of hemoglobin in these abnormal cells. (Id. ¶ 19.)  In the Multi-Target Colorectal Cancer Screening Test for the Detection of Colorectal Advanced Adenomatous Polyps and Cancer ("DeeP-C") Study, involving over 10,000 subjects, Cologuard® demonstrated sensitivity at 92% of that seen with colonoscopy in detecting colorectal cancer. (Id. ¶ 21.)  It demonstrated sensitivity significantly greater than that seen for the fecal immunochemical test in detecting colorectal cancer and advanced adenomas. (Id.) The results of the DeeP-C Study were published in the New England Journal of Medicine in April 2014. (Id. ¶ 22.)  These sensitivity and specificity results were corroborated in a subsequent study involving over 600 Alaska natives. (Id. ¶ 23.)

Cologuard® received premarket approval from the U.S. Food and Drug Administration ("FDA") on August 11, 2014 and was the first DNA screening test for colorectal cancer approved by the FDA. (Id. ¶¶ 24, 25.) Effective October 9, 2014, the Centers for Medicare and Medicaid Services ("CMS") extended coverage to Cologuard® across the Medicare Program by the National Coverage Determination for Colorectal Cancer Screening Tests. (Id. ¶ 26.) As a result, Cologuard® became the first medical product successfully to complete the joint FDA-CMS parallel review process. (Id. ¶ 27.) Numerous commercial health plans have extended coverage to Cologuard® such that seventeen months following FDA approval, Cologuard® has a coverage footprint of 110 million or more Americans in the Medicare Program and commercial health plans. (Id. ¶¶ 32, 33.) In addition, the American Cancer Society ("ACS") specifies sDNA tests and Cologuard® in its current guidelines for colorectal screening. (Id. ¶ 34.) Not only do the guidelines state, "Beginning at age 50, people at average risk with no symptoms should follow one of the testing options below: . . . Stool DNA test (sDNA), every 3 years", but the ACS endorses Cologuard® as "the test currently available" in its recommendations. (Id. ¶¶ 35, 36.)

BCBS-NC provides healthcare insurance, administration, and/or benefits to policyholders or plan participants pursuant to a variety of healthcare benefit plans and insurance policies, including employer-sponsored benefit plans, government-sponsored benefit plans, Medicare Advantage plans, and individual health benefit plans (collectively referred to as "the Plans"). (Id. ¶ 2.) As of the date of the

3

Amended Complaint, since October 2014, Exact has performed approximately 1,341 Cologuard® tests for BCBS-NC Subscribers in at least nine different states and billed BCBS-NC for those services. (Id. ¶¶ 4, 55.) These Subscribers "generally provide Exact with a 'Patient Assignment of Benefits Notice (AOB)'". (Id. ¶ 43.) Although the language of the AOBs has changed from time to time, Subscribers assign to Exact their right to receive benefits and challenge benefit denials under the applicable Plans for the Cologuard® test. (Id. ¶ 44; see also id. ¶¶ 45-47 (providing relevant language from three AOBs).) All BCBS-NC Plans provide coverage for colorectal screening tests or examinations, unless the test or examination fits within the definition of "Experimental" or "Investigational" under the terms of the applicable Plan. (Id. ¶ 41.)

As of the date of the Amended Complaint, BCBS-NC has denied 507 Cologuard® claims under commercial plans, Medicare Advantage plan, and otherwise, totaling in excess of $321,893 and has underpaid a number of claims.[1] (Id. ¶¶ 1, 54, 62, 64 (citing Ex. 1 to Am. Compl.[2] [Doc. #16-1]).) It has also denied at least 65% of the claim denials that Exact has appealed. (Id. ¶ 64 (citing

---

[1] The somewhat inconsistent and imprecise phrasing of the various allegations throughout the Amended Complaint of denied claims, underpaid claims, and appealed claims leaves the Court with questions. However, for purposes of BCBS-NC's instant challenges to the Amended Complaint, these questions need not be addressed presently.

[2] Exact cites to Exhibit 1 in support of several allegations of denied claims, underpaid claims, and appeal denials. But, as presented and even in the context of the various allegations, it is difficult to determine the import of the information provided in the exhibit.

Ex. 1 to Am. Compl.).)  According to Exact, regardless of the Plans' language, N.C.

Gen. Stat. § 58-3-179, referred to as "the Coverage Mandate", requires BCBS-NC

to cover costs for colorectal cancer screening tests recommended by the ACS for

colorectal screening. (Id. ¶¶ 3, 39.)  The Coverage Mandate states

> (a) Every health benefit plan, as defined in G.S. 58-3-167, shall provide
> coverage for colorectal cancer examinations and laboratory tests for
> cancer, in accordance with the most recently published [ACS]
> guidelines or guidelines adopted by the North Carolina Advisory
> Committee on Cancer Coordination and Control [("NC Advisory
> Committee")] for colorectal cancer screening, for any
> nonsymptomatic covered individual who is:
>
> > (1) At least 50 years of age, or
> >
> > (2) Less than 50 years of age and at high risk for colorectal cancer
> > according to the most recently published colorectal cancer
> > screening guidelines of the [ACS] or guidelines adopted by the
> > [NC Advisory Committee].
>
> The same deductibles, coinsurance, and other limitations as apply to
> similar services covered under the plan apply to coverage for colorectal
> examinations and laboratory tests required to be covered under this
> section.
>
> (b) Reserved.

After Exact demanded that BCBS-NC provide benefits for Cologuard® as the

Coverage Mandate allegedly requires, BCBS-NC responded by letter dated

November 23, 2015. (Id. ¶ 57 (citing Ex. 2 to Am. Compl. (Letter from Janet L.

McCauley, M.D., Sr. Med. Dir. Med. & Reimbursement Policy, BCBS-NC to Michael

D. Dugan, M.D., Sr. V.P. Clinical Development & Med. Affairs, Exact Sciences)

[Doc. #16-2]).)  After acknowledging that "[c]urrently, [BCBS-NC] does not provide

benefits for Cologuard", BCBS-NC asserted that it was in compliance with the

5

Coverage Mandate. (Nov. 23, 2015 Letter at 1.) BCBS-NC explained that its "benefits for colorectal screening match what is recommended by the [NC Advisory Committee] as well as the U.S. Preventive Services Task Force". (Id.) BCBS-NC further explained eligibility for benefits and the development of its medical policies before stating, "[a]t this time, we find there is insufficient medical and scientific evidence to permit BCBSNC to evaluate the therapeutic value of Cologuard and to make conclusions regarding the efficacy and long-term effects on the net health outcomes of this technology." (Id. at 1-2.) At the time of the letter, Blue Cross Blue Shield Association considered Cologuard® "to be investigational due to the uncertainty of the diagnostic accuracy of stool DNA analysis and a lack of demonstrated clinical utility." (Id. at 2.) BCBS-NC explained that it "welcome[d] and encourage[d] providers to forward any current peer-reviewed literature based on well-designed studies that may not have been included in [its] own search" and that it would "review and make any changes indicated." (Id. at 2.) BCBS-NC offered Exact the option to submit additional evidence-based references through the Evidence Street program recently established by the Blue Cross Blue Shield Association. (Id. at 2-3.)

On December 29, 2015, Exact responded by letter to BCBS-NC's November correspondence. (See Am. Compl. ¶ 58 (citing Ex. 3 to Am. Compl. (Letter from Gary S. Qualls, Counsel for Exact Sciences to Lou Patalano, V.P. & Deputy Gen. Counsel BCBS-NC) [Doc. #16-3]).) In sum, Exact contended that the Coverage Mandate compelled coverage for two independent reasons. (Dec. 29, 2015 Letter

6

at 3.)  First, according to Exact, coverage is required if tests are included in either the ACS guidelines or guidelines, if any, of the NC Advisory Committee. (Id.) Second, the NC Advisory Committee's statements do not purport to be guidelines. (Id.)  Because Cologuard® meets the ACS guidelines, BCBS-NC must cover Cologuard®. (Id.)

BCBS-NC responded on January 29, 2016 by letter. (Am. Compl. ¶ 59 (citing Ex. 4 to Am. Compl. (Letter from Melissa K. Kaluzny, Managing Counsel BCBS-NC to Gary S. Qualls, Counsel for Exact Sciences) [Doc. #16-4]).)  It acknowledged that the NC Advisory Committee document it had considered to be guidelines were not, in fact, guidelines. (Jan. 29, 2016 Letter at 1.) "Nevertheless," BCBS-NC's "position" was that it could "continue to deny stool DNA tests even though they are referenced under the [ACS] Guidelines due to the lack of clinical support for the test." (Id.)  BCBS-NC based this conclusion on language in the Coverage Mandate that states, "The same . . . other limitations as apply to similar services covered under the plan apply to coverage for colorectal examinations and laboratory tests required to be covered under [the Coverage Mandate]." (Id. at 1-2)  According to BCBS-NC, "whether a service meets the health plan's definition of 'medical necessity' is a 'limitation' under the plan.  As such, BCBSNC may apply its medical necessity definition to colorectal examinations and laboratory tests that may appear to be covered under [the Coverage Mandate]." (Id. at 2.)  Applying the definition of medical necessity from BCBS-NC's benefit booklets, it noted that medical services are not medically

7

necessary if, among other things, they are investigational. (Id.)  Because BCBS-NC had determined that there was insufficient medical and scientific evidence to permit it to evaluate the therapeutic value of Cologuard® and to make conclusions as to its efficacy and long-term effects on the net health outcomes, it found Cologuard® to be investigational, as that term was defined in BCBS-NC's benefit booklets, and, thus, not medically necessary. (Id. at 3-4.)

According to Exact, it "has repeatedly and in good faith sought to exhaust all known available appeal avenues under [the] Plans in an effort to convince BCBS-NC to reimburse Exact properly on its claims for Cologuard® tests that it provided to the BCBS-NC Subscribers." (Am. Compl. ¶ 63.)  "BCBS-NC has not favorably responded to Exact's demands or otherwise given any indication that it is willing to reconsider" its "policy . . . to exclude all Cologuard® claims." (Id. ¶¶ 68, 69.)  In support of this allegation, Exact directs the Court to "a Sample Notice of First Level Internal Adverse Benefit Determination" that "demonstrates that BCBS-NC is entrenched in its general policy position for its Plans to exclude all Cologuard® claims." (Id. ¶ 71 & Ex. 6 to Am. Compl. [Doc. #16-6]; see also id. ¶ 72 (citing Exs. 2 & 4 in further support of this contention).)

As a result, Exact sued BCBS-NC and asserted fourteen claims: (1) Benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); (2) Breach of Fiduciary Duties under ERISA § 502(a)(3), 29 U.S.C. § 1332(a)(3); (3) Denial of Full and Fair Review under ERISA § 503, 29 U.S.C. § 1133; (4) Declaratory Judgment for Violation of Coverage Mandate, N.C. Gen. Stat. § 58-3-179; (5) Unfair and

8

Deceptive Trade Practices, N.C. Gen. Stat. § 75-1.1, Violation of Coverage Mandate, and Violation of Insurance Claims Settlement Act, N.C. Gen. Stat. § 58-63-15(11); (6) Unfair and Deceptive Trade Practices and Violation of Coverage Mandate; (7) Breach of Contract (non-ERISA); (8) Breach of Contract as Third-Party Beneficiary (non-ERISA); (9) Breach of Fiduciary Duty (non-ERISA); (10) Breach of Duty of Good Faith and Fair Dealing (non-ERISA); (11) Declaratory Judgment for Violation of Prompt Pay Act, N.C. Gen. Stat. § 58-3-225, (non-ERISA); (12) Unfair and Deceptive Trade Practices and Violation of Prompt Pay Act (non-ERISA); (13) Unfair and Deceptive Trade Practices, Violation of Coverage Mandate, and Violation of Prompt Pay Act (non-ERISA); and (14) Quantum Meruit (non-ERISA).

## II.

BCBS-NC presents a number of challenges to Exact's ERISA claims.  As to each of them, it argues that Exact lacks standing to bring the claims. (Mem. of Law in Supp. of Def.'s Mot. to Dismiss ("Def.'s Br. in Supp.") at 4-11 [Doc. #26].) In addition, as to Count 1, BCBS-NC argues that Exact failed to allege sufficiently a claim for benefits and exhaustion of administrative remedies. (Id. at 3, 11-12.)  As to Count 2, BCBS-NC argues that § 502(a)(3) of ERISA does not afford equitable relief, that Exact has not alleged a basis for a fiduciary duty owed to Exact other than through the AOBs, and that Exact has failed to allege sufficiently exhaustion of administrative remedies. (Id. at 11-13.)  As to Count 3, BCBS-NC argues that Exact has failed to allege any facts pertaining to BCBS-NC's review process and,

even if it had, the appropriate remedy is remand, and that Exact has failed to allege

sufficiently exhaustion of administrative remedies. (Id. at 11-12, 13-14.)

## A.

BCBS-NC argues, and Exact seemingly concedes, that Exact lacks direct

standing as a health care service provider to bring a claim under ERISA. (Id. at 4.)

Further, BCBS-NC contends that Exact lacks derivative standing for its ERISA

claims because the AOBs are ineffective pursuant to the anti-assignment provision

in BCBS-NC Plans, it has only vaguely alleged "that some of [its] patients signed

one of three different AOBs", and two of the AOBs do not assign to Exact the right

to bring this lawsuit while the third is an unconscionable contract of adhesion. (Id.

at 4-11.)

## 1.

In support of its argument that the AOBs are ineffective pursuant to the anti-

assignment provision in BCBS-NC Plans, BCBS-NC attached to its Memorandum of

Law in Support of its Motion to Dismiss "[a] sample of a BCBS-NC ERISA and a

non-ERISA plan's cover page and anti-assignment clause", both of which "contain

BCBS-NC's standard anti-assignment clause". (Id. at 4 (referring to Ex. A. [Doc.

#26-1]).)  It also argues that, in its anti-assignment clause, it specifically

manifested its intent not to waive the assignment prohibition. (Id. at 5-6).  BCBS-

NC focuses on this Court's opinion in Total Renal Care of NC, L.L.C. v. The Fresh

Market, Inc., No. 1:05CV00819, 2008 WL 623494 (M.D.N.C. Mar. 6, 2008), in

support of its argument that, "Under federal law in North Carolina, the content of

10

an assignment need not even be considered when, as is the case here, a valid anti-assignment provision is in place." (Def.'s Reply Br. in Further Supp. of Mot. to Dismiss the Am. Compl. at 3-4 [Doc. #35]; see also Def.'s Br. in Supp. at 5.) Yet, BCBS-NC fails to recognize that before the Court in Total Renal Care of NC, L.L.C. were motions for summary judgment, not a motion to dismiss, as here.

Exact contests the Court's consideration of the sample anti-assignment clauses because the terms of all relevant Plans are not in the Amended Complaint, not attached to the motion, and not known to Exact. (Pls.' Br. Opposing Def.'s Mot. to Dismiss ("Pls.' Br. in Opp'n") at 4-5 [Doc. #31].) While a court may consider documents attached to a motion to dismiss, it may do so only when they are integral to the complaint and authentic. Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Although BCBS-NC argues that the anti-assignment language reflected in the sample anti-assignment clauses it attached to its Memorandum of Law is its standard anti-assignment language, even BCBS-NC acknowledges that it only attached a sample ERISA Plan cover page and anti-assignment clause and a sample non-ERISA Plan coverage page and anti-assignment clause. Exact argues that there has been no discovery thus far and, at this stage, "[r]eliance on these purported clauses is misplaced". (Pls.' Br. in Opp'n at 5.) The Court agrees. For purposes of this motion to dismiss, the two sample anti-assignment clauses that BCBS-NC attached to its Memorandum of Law as Exhibit A and its associated arguments based on those anti-assignment clauses are not considered at this time.

11

2.

Nevertheless, the question remains whether Exact has sufficiently alleged derivative standing, at least at this stage of the proceedings, to pursue its ERISA claims against BCBS-NC.  It is presumed "that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'"  Lexmark Int'l, Inc. v. Static Control Components, Inc., ___ U.S. ___, 134 S. Ct. 1377, 1388 (2014) (concluding that the zone-of-interests test was "an appropriate tool for determining who may invoke the cause of action" under the relevant statute).  "Statutory standing applies only to legislatively-created causes of action and concerns whether a statute creating a private right of action authorizes a particular plaintiff to avail [itself] of that right of action." CGM, LLC v. Bellsouth Telecomms., Inc., 664 F.3d 46, 52 (4th Cir. 2011).  The Fourth Circuit Court of Appeals "has framed the statutory standing inquiry as whether the plaintiff 'is a member of the class given authority by a statute to bring suit . . . .'" Id. (quoting In re Mutual Funds, 529 F.3d 207, 216 (4th Cir. 2008)).  In addition, for a plaintiff to have Article III standing, it "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." Lexmark Int'l, Inc., 134 S. Ct. at 1386 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

Only a "participant" or "beneficiary" may bring an action under ERISA "to recover benefits due him under the terms of his plan, to enforce his rights under

12

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan". 29 U.S.C. § 1132(a). "Healthcare providers . . . are generally not 'participants' or 'beneficiaries' under ERISA and thus lack independent standing to sue under ERISA." Kearney v. Blue Cross & Blue Shield of N.C., No. 1:16-cv-191, 2017 WL 530521, *4 (M.D.N.C. Feb. 9, 2017) (quoting Gables Ins. Recovery, Inc. v. Blue Cross & Blue Shield of Fla., Inc., 813 F.3d 1333, 1338 (11th Cir. 2015)).

Although the Fourth Circuit Court of Appeals has not addressed the question of derivative standing for ERISA benefits, it has acknowledged with approval that its "sister circuits have consistently recognized such standing when based on the valid assignment of ERISA health and welfare benefits by participants and beneficiaries." See Brown v. Sikora & Assocs., Inc., 311 F. App'x 568, 570 (Apr. 16, 2008) (unpublished). The court described those circuit court cases as "represent[ing] a careful balance of competing concerns, in part grounded on the recognition that extending derivative standing to health care providers serves to further the explicit purpose of ERISA in a number of distinct ways." Id. Courts within the Fourth Circuit have found "that a healthcare provider may acquire derivative standing under ERISA by obtaining a written assignment from a participant or beneficiary of his right to payment of medical benefits." Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc., 723 F. Supp. 2d 814, 819 (D. Md. 2010); see also, e.g., Kearney, 2017 WL 530521, at *5 (concluding, at the motion to dismiss stage, that the plaintiff medical practice plausibly alleged that derivative standing as the assignee of plan participants or beneficiaries to sue for

13

unpaid benefits under ERISA); <u>Conn. Gen. Life Ins. Co. v. Advanced Surgery Ctr.</u> <u>of Bethesda, LLC</u>, No. DKC 14-2376, 2015 WL 4394408, *27 (D. Md. July 15, 2015) (finding, at the motion to dismiss stage, that the counter-claimant ambulatory surgical centers plausibly alleged derivative standing to bring ERISA claims on behalf of plan members "who specifically assigned them in writing their 'rights and benefits under their Cigna health insurance plan,' including the 'right to appeal benefit denials and to sue'").

Here, Exact alleges that "Patients prescribed Cologuard®, including BCBS-NC Subscribers, generally provide Exact with a 'Patient Assignment of Benefits Notice (AOB)'". (Am. Compl. ¶ 43.)  Even though Exact used different language in its AOBs from time to time, it alleges that in the AOBs, Subscribers "assign to Exact their right to receive benefits and challenge benefit denials under the applicable Plans for [Cologuard®]." (<u>Id.</u> ¶ 44.)  Indeed, the quoted language allegedly from three AOBs confirms this assignment.  One AOB reads, in relevant part, "**Authorization to assign benefits, accept financial responsibility, and disclose health records:** I authorize [Exact] to bill my insurance/health plan . . . for reimbursement, to appeal any reimbursement denial . . . ." (<u>Id.</u> ¶ 45.)  The second AOB similarly reads, in relevant part, "I authorize [Exact] to bill my insurance/health plan . . . for reimbursement.  I assign all rights & benefits under my insurance plans to Exact & authorize Exact to appeal & contest any reimbursement denial, including in any administrative or civil proceedings necessary to pursue reimbursement." (<u>Id.</u> 46.)  The third AOB reads, in relevant part,

I authorize [Exact] to bill my insurance/health plan . . . for reimbursement. I irrevocably assign all rights & benefits under any insurance policy(ies) or employee benefit plan(s) under which I am insured or covered as a participant, beneficiary, dependent, or otherwise . . . to Exact. **THIS IS A DIRECT ASSIGNMENT TO EXACT OF ANY AND ALL OF MY RIGHTS TO RECEIVE THE INSURANCE BENEFITS**. . . . This assignment of benefits fully and completely encompasses any and all rights and legal claims I may have, under [ERISA], or otherwise, under any applicable plan or policy of insurance to receive the Insurance Benefits. These legal rights and legal claims include, but are not limited to: (1) my rights to make a claim for and/or appeal any denial of . . . Insurance Benefits on my behalf; (2) my rights to pursue legal action against the applicable third-party payer for unpaid benefits or for violating any contractual, statutory, legal or equitable duties to me, including, but not limited to, any and all claims I may have for unpaid benefits, breach of contract, breach of covenant of good faith and fair dealing, breach of fiduciary duty, denial of a full and fair review, quantum meruit, or unjust enrichment; . . . and (4) my rights to file a complaint with any applicable federal . . . agency against any applicable third-party responsible for providing Insurance Benefits. . . . I hereby appoint Exact . . . as my authorized representative(s) to pursue any claims, penalties, and administrative and/or legal remedies on my behalf for collection against any responsible payer or third party liability carrier of any and all benefits due to me for the payment of charges associated with my treatment."

(Am. Compl. ¶ 47.)

BCBS-NC argues that "[c]onspicuously absent from the first AOB is language assigning [Exact] the right to bring a lawsuit against BCBS-NC." (Def.'s Br. in Supp. at 7.) It also argues that "[t]he second AOB gives [Exact], if anything, the right to file suit demanding payment for services, not the right to file any and all claims." (Id. at 9.) Finally, BCBS-NC argues that "[t]he third AOB is an unconscionable adhesion contract and is therefore invalid" (id.), yet BCBS-NC provides no legal support for its own standing to challenge the third AOB on this ground. The second and third alleged AOBs certainly assign the right to sue BCBS-

15

NC for reimbursement; therefore, at this stage of the proceedings, Exact has plausibly alleged that it has derivative standing to pursue its ERISA claims (Counts 1 through 3). BCBS-NC's motion to dismiss the ERISA claims based on lack of standing is denied. BCBS-NC's additional challenges to Exact's ERISA claims are addressed below.

B.

In Count 1, Exact seeks benefits under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). BCBS-NC argues that Exact has failed to allege sufficiently a claim for denial of benefits and that each and every subscriber exhausted his administrative remedies. Pursuant to § 502(a)(1)(B), a civil action may be brought to recover benefits due to a plan participant under the terms of his plan. 29 U.S.C. § 1132(a)(1)(B). Here, Exact has alleged that "BCBS-NC provides healthcare insurance, administration, and/or benefits to . . . plan participants pursuant to a variety of healthcare benefit plans and policies of insurance, including employer-sponsored benefit plans . . . (the 'Plans')." (Am. Compl. ¶ 2.) North Carolina's Coverage Mandate allegedly requires BCBS-NC to cover costs for colorectal cancer screening tests like Cologuard®, and, "[u]pon information and belief, all BCBS-NC Plans provide coverage for colorectal screening tests or examinations, unless the test or examination fits within the definition of 'Experimental or Investigational' under the terms of the applicable Plan." (Id. ¶¶ 3, 41, 50-53.) "Upon information and belief, BCBS-NC Plans require reimbursement of medical expenses incurred by BCBS-NC Subscribers at usual, customary, and reasonable rates", and "BCBS-NC

16

is obligated to pay for medically necessary services, covered services, and covered benefits as defined under its Plans." (Id. ¶¶ 84, 85.) Exact has allegedly performed approximately 1,341 Cologuard® tests since October 2014, but BCBS-NC has denied 507 of those claims. (Id. ¶¶ 1, 4.) According to Exact, BCBS-NC breached the terms of the Plans by refusing to reimburse Exact, an assignee of Subscribers' rights to reimbursement, for charges covered by the Plans. (Id. ¶ 43-47, 86.) BCBS-NC allegedly denied these claims for various reasons, including that Cologuard® is "Experimental or Investigational", and has adopted a policy of doing so, even though Cologuard® is allegedly not experimental or investigational. (Id. ¶¶ 5, 6, 17-37, 56-60.) According to Exact, "BCBS-NC has violated its duties under [ERISA] . . . by failing and refusing to pay Plaintiffs promptly and in full for the tests that Exact has performed for patients covered by the Plans provided or administered by BCBS-NC". (Id. ¶ 3.) In sum, Exact has plausibly alleged a claim for benefits due under the terms of the ERISA Plans.

Furthermore, "failure to exhaust administrative remedies under ERISA is an affirmative defense." Rogers v. Unitedhealth Grp., Inc., 144 F. Supp. 3d 792, 802 (D.S.C. 2015) (citing Taylor v. Oak Forest Health & Rehab., LLC, No. 1:11-CV-471, 2013 WL 4505386, *3 (M.D.N.C. Aug. 22, 2013)). "[T]he burden of establishing the affirmative defense rests on the defendant" such that "a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense". Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc);

17

see also West v. Cont'l Auto., Inc., No. 3:16-cv-00502-FDW-DSC, 2016 WL
6543128, *1 (W.D.N.C. Nov. 2, 2016) ("ERISA plaintiffs are not obligated to
plead exhaustion or futility because failure to exhaust is an affirmative defense that
must be pled and proven by the defendant."). "[I]n the relatively rare
circumstances where facts sufficient to rule on an affirmative defense are alleged
in the complaint, the defense may be reached by a motion to dismiss filed under
Rule 12(b)(6)", but "[t]his principle only applies . . . if all facts necessary to the
affirmative defense 'clearly appear[] on the face of the complaint." Id. This is not
one of those rare circumstances. Nevertheless, even though Exact is not required
to plead exhaustion, it has done so sufficiently and plausibly as to at least some of
the denied claims. BCBS-NC's motion to dismiss Count 1 is denied.

## C.

In Count 2, Exact alleges breach of fiduciary duty pursuant to § 502(a)(3) of
ERISA, 29 U.S.C. § 1132(a)(3). BCBS-NC argues that § 503(a)(3) does not afford
Exact equitable relief because ERISA elsewhere provides Exact an adequate
remedy. (Def.'s Br. in Supp. at 12-13.) The Court agrees. Section 502(a)(3)
provides, in relevant part, that a civil action may be brought "(A) to enjoin any act
or practice which violates any provision of [Subchapter I] or the terms of the plan,
or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii)
to enforce any provisions of [Subchapter I]". 29 U.S.C. § 1132(a)(3). The
Supreme Court has interpreted § 502(a)(3) as providing relief "only for injuries that
do not find adequate redress in ERISA's other provisions." Korotynska v. Metro.

18

Life Ins. Co., 474 F.3d 101, 102 (4th Cir. 2006) (citing Varity Corp. v. Howe, 516 U.S. 489, 515 (1996)). For example, the plaintiffs in Varity could not find adequate redress elsewhere in ERISA. 516 U.S. at 515. They had no benefits due them under the plan's terms because they were no longer members of the plan, so they could not pursue relief under § 502(a)(1). Id. Section 502(a)(2) does not provide a remedy for individual beneficiaries. Id. Therefore, the only relief for the plaintiffs was found in § 502(a)(3) – equitable relief. Id.

However, "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" Varity Corp., 516 U.S. at 515 (noting that "the statute authorizes 'appropriate' equitable relief"). Therefore, when "adequate relief is available for the plaintiff's injury through review of [its] individual benefits claim under § 1132(a)(1)(B), relief under § 1132(a)(3) will not lie." Korotynska, 474 F.3d at 102-03. This is because allegations relating to claims procedures and determinations "are routinely taken up in appeals of benefits denials, and[, as such,] they do not constitute special circumstances for which equitable relief is uniquely appropriate." Id. at 108. Accordingly, courts dismiss the § 503(a)(3) claim even at the motion to dismiss stage. See, e.g., id. at 102 (affirming dismissal of § 503(a)(3) claim on a motion for judgment on the pleadings); Batten v. Aetna Life Ins. Co., No. 3:15cv513, 2016 WL 4435681, *4 (E.D. Va. Aug. 17, 2016) (granting motion to dismiss § 502(a)(3) claim because § 502(a)(1)(B) provided adequate relief for the plaintiff's injury, denial of disability

19

benefits); <u>Wright v. Hartford Life & Accident Ins. Co.</u>, No. 5:14-CV-00126-RLV-DSC, 2015 WL 4488656, *8 (W.D.N.C. July 23, 2015) (granting motion to dismiss § 502(a)(3) claim as duplicative of the plaintiff's § 502(a)(1)(B) claim for disability benefits); <u>Conn. Gen. Life Ins. Co.</u>, 2015 WL 4394408, at *30 (granting motion to dismiss § 502(a)(3) claim because the denial of benefits was redressable under § 502(a)(1)(B)).

Exact initially argues that "<u>Varity</u> does **not** preclude concurrent pleading of such claims." (Pls.' Br. in Opp'n at 14.) Yet, that is precisely how the Fourth Circuit Court of Appeals and courts within the Fourth Circuit have interpreted <u>Varity</u>. <u>See, e.g.</u>, <u>Korotynska</u>, 474 F.3d at 106-07 (explaining that circuit courts with which the Fourth Circuit would join "have not allowed claimants to <u>proceed</u> with § 1132(a)(3) claims where relief was <u>potentially</u> available to them under § 1132(a)(1)(B)" because of <u>Varity</u>) (emphasis added); <u>Batten</u>, 2016 WL 4435681, at *3 (finding "that Batten is precluded from raising a claim under § 502(a)(3), either in the alternative or conjunctively"). Exact then argues that its § 502(a)(1)(B) and § 502(a)(3) claims are not redundant because the § 502(a)(3) claim seeks prospective injunctive and declaratory relief and because "this case is about Blue Cross' continuing policy, not an isolated issue involving non-recurring benefit determinations." (Pls.' Br. in Opp'n at 14.)

In support of its § 502(a)(3) claim, Exact alleges, among other things, that BCBS-NC "violated its fiduciary duty of loyalty to Plaintiffs by . . . refusing to make reimbursements for Cologuard® tests, to its own advantage, at the expense of

BCBS-NC Subscribers" and "by failing to inform Plaintiffs, assignees of the BCBS-NC Subscribers, of material information, by misrepresenting requirements for reimbursement under the Plans." (Am. Compl. ¶ 97.)  Exact additionally alleges that BCBS-NC violated its fiduciary duty by "refusing to cover Cologuard® tests; refusing to allow Plaintiffs an opportunity to negotiate coverage beyond the unduly burdensome terms it has wrongfully required in contravention of applicable law and Plan terms and the Coverage Mandate; and failing to inform Plaintiffs of material information." (Id. ¶ 100.)

These allegations and those for benefits under § 502(a)(1)(B) are not that different than the allegations the counter-claimant ambulatory surgical centers made in Connecticut General Life Insurance Co.  The surgical centers sought benefits under § 502(a)(1)(B) and alleged that the counter-defendant Cigna entities breached the terms of the plans by "arbitrarily denying or reducing payments due to the [surgical centers] based on [their] misconstruction and/or misapplication of [their] plans' exclusion[.]" 2015 WL 4394408, at *28 (first alteration added).  In support of their § 502(a)(3) claim, the surgical centers alleged that the Cigna entities "breached their fiduciary duties by denying or reducing benefits payable to the [surgical centers] for the services they rendered to the Cigna entities' plan members" and that the "claim denials were not only based on their misconstruction and misapplication of the plan language, but also were done to '(a) allow [them] to avoid [their] obligations to pay benefits, (b) discourage [their] insureds from using out-of-network services, and (c) coerce out-of-network providers into becoming in-

21

network providers." Id. The court found that "the crux of the [surgical centers'] allegations supporting the breach of fiduciary duty claim" were that the surgical centers sought plan benefits on behalf of the plan participants and "the Cigna entities improperly denied the . . . claims for benefits based on their misconstruction or misapplication of the plan terms and their alleged self-interested motive of retaining increased compensation and profits." Id. at *30. The court found that this alleged injury was redressable under § 502(a)(1)(B), "which is likely why the [surgical centers] . . . also brought a claim under that provision." Id. Because "[t]he Fourth Circuit does not permit 'plaintiffs to seek relief simultaneously under § [502](a)(1)(B) and § [502](a)(3),' when the injury alleged creates a cause of action under § 502(a)(1)(B)", the court dismissed the § 502(a)(3) claim. Id.

Such is the case here. Despite its superfluous allegations of failure to inform Plaintiffs of material information and misrepresentation which have no factual support in the Amended Complaint, Exact's alleged injuries resulting from the alleged breach of fiduciary duties are redressable under § 502(a)(1)(B) pursuant to which Exact is seeking, in Count 1, the benefits it claims that BCBS-NC has improperly denied. BCBS-NC's motion to dismiss Count 2 is granted. There is no need to address BCBS-NC's other bases for dismissing Count 2.

D.

In Count 3, Exact alleges a denial of full and fair review of denied claims under § 503 of ERISA, 29 U.S.C. § 1133. BCBS-NC argues that Exact has not

22

alleged any facts about BCBS-NC's claims review process and, instead, offers only speculation. (Def.'s Br. in Supp. at 13.) In response, Exact contends that it is BCBS-NC's "across-the-board policy of refusing to pay for Cologuard® [that] has denied Exact full and fair review of each claim." (Pls.' Br. in Opp'n at 15.)

Section 503 of ERISA provides, in relevant part, that "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). Although many of the allegations within Count 3 appear to be speculative, elsewhere in the Amended Complaint the factual allegations state a plausible claim that BCBS-NC has denied Exact a full and fair review of the denied claims.

According to BCBS-NC's representatives in January 2016, BCBS-NC does not cover Cologuard® because BCBS-NC considers Cologuard® to be "Investigational" because "there is insufficient medical and scientific evidence to permit BCBSNC to evaluate the therapeutic value of Cologuard and to make conclusions regarding the efficacy and long-term effects on the net health outcomes of this technology." (Am. Compl. Ex. 4.) Exact alleges that it "has repeatedly demanded that BCBS-NC reverse its previous benefit denials, promptly pay all previously submitted Cologuard® claims and conform its medical policies so that BCBS-NC's entire organization recognizes its obligation to pay for Cologuard® as a covered service", but that "BCBS-NC has failed to comply in full with these demands or provide sufficient assurances that [it] would not repeat its conduct."

23

(Id. ¶¶ 65, 66.)  Instead, "BCBS-NC's policy for its Plans is to exclude all Cologuard® claims." (Id. ¶ 68.)  Combined with these allegations of a policy to deny all Cologuard® claims are the allegations that BCBS-NC has not actually excluded all Cologuard® claims (id. ¶¶ 54, 55, 64), despite its contention that Cologuard® is investigational for reasons not on their face differently applicable to individual Subscribers.  Accordingly, Exact has plausibly alleged denial of full and fair review of its denied claims.  BCBS-NC's motion to dismiss Count 3 is denied.

If this claim progresses further, though, appropriate relief appears to be remand, unless the evidence establishes that BCBS-NC's denial of the claims was an abuse of discretion as a matter of law. See Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 240-41 (4th Cir. 2008) (noting that in cases of a procedural ERISA violation, the "proper remedy [is] to remand to the plan administrator for the 'full and fair review' to which [the claimant] is entitled regarding the denial of benefits").

### III.

The next question is whether Exact has sufficiently alleged standing, at least at this stage of the proceedings, to pursue its non-ERISA claims against BCBS-NC. Standing as to each of these claims will be addressed below, along with BCBS-NC's additional bases for dismissal, as is necessary.

### A.

In Count 4, Exact seeks declaratory relief pursuant to 28 U.S.C. § 2201 for BCBS-NC's alleged violation of the Coverage Mandate.  Despite Exact's arguments

24

to the contrary, there is no private right of action under the Coverage Mandate.

Exact presents no case that has opined on the issue of whether there is an implied

right of action under the Coverage Mandate, and the Court has found none.  Under

North Carolina law, "generally . . . a statute allows for a private cause of action

only where the legislature has expressly provided a private cause of action within

the statute." Lea v. Grier, 577 S.E.2d 411, 415 (N.C. Ct. App. 2003).  A statute

may "enunciate[s] an explicit or implicit intent on the part of the General

Assembly" to afford a private right of action. Id. at 416.  For example, in Williams

v. Alexander County Board of Education, 495 S.E.2d 406, 409 (N.C. Ct. App.

1998), the court analyzed the intent of the General Assembly in enacting teacher

incentive statutes.  The Attorney General's opinion provided to the Board of

Education conceded that the "obvious intent" of the statute was to provide

incentives to teachers. Id. at 408-09.  The language of one of the statutes itself

stated in part that "[I]t is the intent of the General Assembly that any reductions in

appropriations not result in teachers receiving less . . . than they received" before.

Id. at 409.  The court found that "[t]he statutes without doubt enunciate the intent

of the General Assembly in enacting" the applicable statutes. Id. (finding that the

statutory language was "unambiguous, direct, imperative and mandatory").  On the

other hand, the Lea court found that, unlike the relevant statutes in Williams, the

applicable statutes in Lea did not "enunciate an explicit or implicit intent on the

part of the General Assembly to create" a private right of action. 577 S.E.2d at

416.

Here, the Coverage Mandate does include language that requires every health benefit plan to provide coverage for colorectal cancer examinations and laboratory tests. See N.C. Gen. Stat. § 58-3-179. However, the statute falls under Chapter 58, "Insurance", of the North Carolina General Statutes. Pursuant to § 58-2-40(5), the Commissioner of Insurance "shall . . . [r]eport in detail to the Attorney General any violations of the laws relative to insurance companies . . .; and the Commissioner may institute civil actions or criminal prosecutions either by the Attorney General or another attorney whom the Attorney General may select, for any violation of the provisions of Articles 1 through 64 of this Chapter [58: Insurance]." This statute appears to contradict Exact's argument that the language of the Coverage Mandate creates an implied private right of action.

Furthermore, the Fourth Circuit Court of Appeals has held that "federal courts should be reluctant to read private rights of action into state laws where state courts and state legislatures have not done so." Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 229 (4th Cir. 2004). "Without clear and specific evidence of legislative intent, the creation of a private right of action by a federal court abrogates both the prerogatives of the political branches and the obvious authority of states to sculpt the content of state law." Id. at 229-30 (finding that a Virginia statute stating "[i]f an accident and sickness insurance policy provides reimbursement for any service that may be legally performed by a person licensed in this Commonwealth as a chiropractor . . . reimbursement under the policy shall not be denied because the service is rendered by the licensed

26

practitioner" did not explicitly create a private right of action and there was no evidence of a legislative intent to create one).  Therefore, it is determined that the language of the Coverage Mandate does not explicitly create a private cause of action and there is no evidence of legislative intent to do so.

Even if there were a private right of action, the alleged injury (Am. Compl. ¶ 115) and relief sought (id. ¶ 117) are based on BCBS-NC's failure to provide its Subscribers coverage for Cologuard®.  That is an injury sustained by the Subscribers, not Exact.  Because the Declaratory Judgment Act, 28 U.S.C. § 2201, is "remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights", CGM, LLC, 664 F.3d at 55, it does not save Count 4.  BCBS-NC's motion to dismiss this claim is granted.  There is no need to address BCBS-NC's other challenges to Count 4.

## B.

In Count 5, Exact alleges that BCBS-NC has engaged in unfair and deceptive trade practices "by refusing to pay for Cologuard® tests as required by the Coverage Mandate" and by engaging in acts prohibited by the Insurance Claims Act, N.C. Gen. Stat. § 58-63-15(11), including by violating the Coverage Mandate.[3] (Am. Compl. ¶¶ 121, 123, 125, 129.)  In other words, BCBS-NC

---

[3] BCBS-NC argues that "to the extent that Counts Five through Fourteen seek redress based on ERISA, they are preempted and should be dismissed." (Def.'s Br. in Supp. at 15-16.)  Exact responds that ERISA does not preempt the Coverage Mandate and Prompt Pay Act and that, otherwise, its non-ERISA claims apply to non-ERISA Plans. (Pls.' Br. in Opp'n at 15-17.)  BCBS-NC's preemption challenge focuses, though, on the unfair and deceptive trade practices, breach of contract,

27

allegedly violated the Coverage Mandate, which violated N.C. Gen. Stat. § 58-63-15(11), which constituted unfair and deceptive trade practices.

Exact alleges that BCBS-NC's violation of the Coverage Mandate caused "actual injury to Exact by not paying for such tests which Exact provided to BCBS-NC Subscribers." (Id. ¶ 121.)  Similarly, Exact alleges that BCBS-NC's violation of N.C. Gen. Stat. § 58-63-15(11) caused "actual injury to Exact by BCBS-NC's refusal to pay for the Cologuard® tests as required by the Coverage Mandate." (Id. ¶ 124.)  Exact also alleges that BCBS-NC's violation of § 58-63-15(11) "has deprived Exact of its reasonable expectations and benefits" both "regardless of its status as an assignee of benefits under the Plans" (id. ¶ 130) and "as an assignee of benefits under the Plans" (id. ¶ 129).

As was the case in Count 4, Exact does not have standing to assert a violation of the Coverage Mandate because there is no private right of action.  In addition, the Court has not located a case finding that a violation of the Coverage Mandate violates one of the provisions of N.C. Gen. Stat. § 58-63-15(11). Furthermore, unlike cases finding that a violation of N.C. Gen. Stat. § 58-63-15(11) constitutes an unfair and deceptive trade practice, thereby permitting a claim for unfair and deceptive trade practices even though there is no private right of action under § 58-63-15(11), the Court has located no case finding that a

breach of the duty of good faith and fair dealing, and breach of fiduciary duty claims. (See Def.'s Br. in Supp. at 15 (specifically identifying these causes of action as preempted by ERISA).)  As Exact explained, it asserts those claims for the Plans not covered by ERISA, and that is how the Court has proceeded.

violation of the Coverage Mandate is an unfair and deceptive trade practice permitting a claim for the latter.

Even if there were a private right of action, the alleged injuries are those of the Subscribers, not Exact. In addition, "[i]t is well settled that claims for unfair and deceptive trade practices under N.C. Gen. Stat. section 75-1.1 are not assignable." Horton v. New South Ins. Co., 468 S.E.2d 856, 858 (N.C. Ct. App. 1996). Furthermore, claims that "seek damages based on tort, not merely on simple breach of contract" are not assignable, because such assignments are "void as against public policy because they promote champerty." Id. Such personal torts include bad faith refusal to settle, tortious breach of contract, and violations of North Carolina General Statutes § 58-63-1 et seq., among others. Id. BCBS-NC's motion to dismiss Count 5 is granted. There is no need to address its other challenges to Count 5.

C.

In Count 6, Exact alleges that BCBS-NC engaged in unfair and deceptive trade practices by violating the Coverage Mandate, allegations that mirror those in Count 5 but for the omission in Count 6 of references to N.C. Gen. Stat. § 58-63-15(11). For the reasons explained above, Exact lacks both direct and derivative standing to bring this claim. BCBS-NC's motion to dismiss Count 6 is granted. There is no need to address its other challenges to Count 6.

D.

In Count 7, Exact alleges that BCBS-NC breached the terms of the non-ERISA Plans when it "failed to make payment of benefits to Exact [as the assignee] in the manner and amounts required under the terms of the Plans, the Coverage Mandate, and other applicable state and federal laws". (Am. Compl. ¶ 152.) Under North Carolina law, "[a]n action 'arising out of contract' generally can be assigned." Horton, 468 S.E.2d at 858. The terms of at least two of the AOBs evidence the Subscribers' assignment to Exact of their contractual right to benefits under the Plans. (See supra § II.A.2.) Accordingly, it is determined that Exact has standing as the Subscribers' assignee to bring this claim.

Count 7 having withstood the standing challenge, BCBS-NC next argues that Exact has failed to state a claim for breach of contract because it is not a party to the contract "and the anti-assignment clause contained in BCBS-NC's plans demonstrates that BCBS-NC's subscribers are the only parties intended to obtain benefits under the contract." (Defs.' Br. in Supp. at 17-18.) That may well be the case, but, at this stage of the proceedings, the Court is not considering the purported sample anti-assignment clauses provided by BCBS-NC, as explained earlier. According to the language in at least two of the AOBs, the Subscribers assigned to Exact their rights to pursue benefits due under the Plans. As a result, Exact may assert a claim for breach of contract in so doing. BCBS-NC's motion to dismiss Count 7 is denied.

30

E.

In Count 8, Exact alleges breach of contract as a third-party beneficiary. On the one hand, it appears as though Exact alleges standing as a result of its status as an assignee. (Am. Compl. ¶¶ 162-63.) Yet, derivative standing to bring a third-party beneficiary claim does not make sense, as the BCBS-NC Subscribers were not third-party beneficiaries to their BCBS-NC Plans who then assigned those rights to Exact. On the other hand, though, Exact seems to allege direct standing as a third-party beneficiary to the BCBS-NC Plans. (Id. ¶¶ 159-61.)

"North Carolina recognizes the right of a third-party beneficiary . . . to sue for breach of contract executed for his benefit", but "plaintiffs must show they were an intended beneficiary of the contract." Town of Belhaven, NC v. Pantego Creek, LLC, 793 S.E.2d 711, 719 (N.C. Ct. App. 2016) (quoting Babb. v. Bynum & Murphrey, PLLC, 643 S.E.2d 55, 57 (N.C. Ct. App. 2007)). To do so, plaintiffs must show that a valid, enforceable contract exists between two parties and "that the contract was executed for the direct, and not incidental, benefit of the [third party]." Id. (quoting Babb, 643 S.E.2d at 57). "A person is a direct beneficiary of the contract if the contracting parties intended to confer a legally enforceable benefit on that person. It is not enough that the contract, in fact, benefits the [third party], if, when the contract was made, the contracting parties did not intend it to benefit the [third party] directly." Id. (quoting Babb, 643 S.E.2d at 57). "[C]ircumstances surrounding the transaction" and "the actual language of the contract" inform the analysis. Id. (quoting Babb, 643 S.E.2d at 57-58).

31

Exact alleges that it is a third-party beneficiary because "BCBS-NC intended to reimburse providers under the Plans and insurance contracts for services provided to BCBS-NC Subscribers" (Am. Compl. ¶ 159), but there is no factual support for the allegation that Exact is a third-party beneficiary to the Plans executed between BCBS-NC and its Subscribers. Instead, Exact actually alleges that "BCBS-NC provides healthcare insurance, administration, and/or benefits to policyholders or plan participants". (Id. ¶ 2.) "[A]ll of the Plans require reimbursement of medically necessary medical expenses incurred by BCBS-NC Subscribers", and, "under the terms of the Plans, BCBS-NC Subscribers are entitled to coverage for the services that they received from Exact." (Id. ¶ 150.) These allegations, as opposed to Exact's conclusory allegation that it is a third-party beneficiary of the Plans, make sense. Individuals enter into contracts for health insurance coverage so that they may receive medical benefits for healthcare services they receive. It is not plausible that they enter into contracts for health insurance coverage intending the healthcare provider to be the direct beneficiary and conferring a legally enforceable right on the provider, instead of the individual. BCBS-NC's motion to dismiss Count 8 is granted.

F.

In Count 9, Exact alleges that BCBS-NC breached its fiduciary duty to its Subscribers and Exact, as their assignee. BCBS-NC argues that Exact has "failed to allege any facts that would place BCBS-NC in a fiduciary relationship with Plaintiffs." (Def.'s Br. in Supp. at 18.) The Court agrees. "For a breach of

32

fiduciary duty to exist, there must first be a fiduciary relationship between the parties." Green v. Freeman, 749 S.E.2d 262, 268 (N.C. 2013) (quoting Dalton v. Camp, 548 S.E.2d 704, 707 (N.C. 2001)). "A fiduciary relationship may arise when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Id. (quoting Dalton, 548 S.E.2d at 707). Moreover, a "claim for breach of fiduciary duty is . . . personal to the insured because it concerns a special relationship of trust and confidence" and, therefore, "cannot be assigned." Horton, 468 S.E.2d at 858). Exact has alleged no facts to support a fiduciary relationship between it and BCBS-NC. Had it alleged facts to support such a relationship between BCBS-NC and its Subscribers, such a claim would not be assignable. BCBS-NC's motion to dismiss Count 9 is granted.

G.

In Count 10, Exact alleges that BCBS-NC breached the duty of good faith and fair dealing and alleges both direct and derivative standing. (Am. Compl. ¶¶ 175-77, 178-79, 182.) Exact asserts that the Plans are "valid and enforceable insurance contracts" and "[a]s such, the Plans contain an implied duty of good faith and fair dealing." (Id. ¶ 174.) It further alleges that "BCBS-NC's conduct in derogation of its duty of good faith and fair dealing under the Plans has deprived Plaintiffs of their reasonable expectations and benefits directly". (Id. ¶ 182.) It is unclear how Exact has suffered direct injury when its allegations of the existence of a duty of good faith and fair dealing rest on a contract to which Exact was not a

33

party nor a third-party beneficiary.  However, Exact does sufficiently allege derivative standing.  "[A]s the obligor under the Plans, [BCBS-NC] owed [its] Subscribers a duty of good faith and fair dealing with respect to said Plans." (Id. ¶ 176.)  While the first two AOBs assigned Exact only the right to pursue benefits under the Plans, the third AOB did explicitly assign the right to pursue a claim for breach of the duty of good faith and fair dealing. (See supra § II.A.2.)

Nevertheless, BCBS-NC argues that "North Carolina does not recognize an independent cause of action for breaching the implied duty of good faith and fair dealing under the circumstances alleged by Plaintiffs." (Def.'s Br. in Supp. at 18-19.)  In response, Exact contends that this claim is "not duplicative of its breach of contract claim due to Blue Cross's special relationship with insureds." (Pls.' Br. in Opp'n at 20.)  North Carolina courts have recognized that "[t]here is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract". Bicycle Transit Auth. v. Bell, 333 S.E.2d 299, 305 (N.C. 1985) quoted in Arnesen v. Rivers Edge Golf Club & Plantation, Inc., 781 S.E.2d 1, 9 (N.C. 2015).  However, "the weight of North Carolina authority holds that a claim for breach of covenant of good faith and fair dealing based on facts identical to those supporting a breach of contract claim should not be pursued separately." B. Lewis Prods., Inc. v. Maya Angelou, Hallmark Cards, Inc., No. 01Civ.0530MBM, 2005 WL 1138474, *11 (S.D.N.Y. May 12, 2005).

Here, Exact alleges that BCBS-NC breached its duty of good faith and fair dealing "in a number of ways, described more fully above [in the Amended Complaint], including wrongfully denying claims for costs associated with Cologuard® tests in violation of the Plans, state and federal law [including the Coverage Mandate], and under false pretenses." (Am. Compl. ¶ 180, 181.) These allegations are nearly identical to the allegations in support of BCBS-NC's breach of contract: "BCBS-NC failed to make payments of benefits to Exact in the manner and amounts required under the terms of the Plans, the Coverage Mandate, and other applicable state and federal laws, and thus breached such contracts." (Id. ¶ 152.) This is not surprising because Exact essentially grounds its allegation of breach of the duty of good faith and fair dealing on the breach of an express term of the contract. Because Exact bases its breach of the duty of good faith and fair dealing on the same factual allegations as form its breach of contract claim, the former cannot be pursued independently. BCBS-NC's motion to dismiss Count 10 is granted.

H.

In Count 11, Exact seeks declaratory relief pursuant to 28 U.S.C. § 2201 for BCBS-NC's alleged violation of the Prompt Pay Act, N.C. Gen. Stat. § 58-3-225, which allegedly requires BCBS-NC to "respond promptly to a beneficiary's coverage claims and provide adequate written explanations for a failure to pay all or a portion of such claims within statutorily prescribed time frames." (Am. Compl. ¶¶ 185.) As with the Coverage Mandate, there is no private right of action under

35

the Prompt Pay Act. <u>Kearney</u>, 2017 WL 530521, at *6-7 (providing a thorough analysis of why the Prompt Pay Act does not authorize a private right of action); (<u>see also</u> <u>supra</u> § III.A. (explaining the process for determining if a statute affords a private right of action)). Because the Declaratory Judgment Act is remedial and grants no substantive rights, it cannot save the claim. BCBS-NC's motion to dismiss Count 11 is granted.

## I.

In Count 12, Exact alleges unfair and deceptive trade practices resulting from BCBS-NC's violation of the Prompt Pay Act.[4] Because of the references to Exact's actual injuries resulting from BCBS-NC's violation of the Coverage Mandate, rather than the Prompt Pay Act, it is difficult to determine precisely what type of standing Exact alleges. The injuries are alleged to be those caused by BCBS-NC's "not paying for [Cologuard®] tests", "wrongfully denying claims for costs associated with Cologuard® tests in violation of the Plans, state and federal law, and under false pretenses; refusing to allow Plaintiffs any opportunity to negotiate coverage beyond the unduly burdensome terms it has wrongfully required in contravention of applicable law and Plan terms; and failing to inform Plaintiffs of material information." (Am. Comp. ¶¶ 197, 209.) These are injuries sustained by the Plan Subscribers, not Exact. To the extent that Exact alleges derivative

---

[4] Most of the allegations in Count 12 are the same allegations as in Count 5 in which Exact alleges unfair and deceptive trade practices resulting from BCBS-NC's violation of the Coverage Mandate. (Compare Am. Compl. ¶¶ 135-47 <u>with</u> <u>id.</u> ¶¶ 196-204.)

36

standing as an assignee of benefits under the Plans, as explained above (supra § III.B.), claims for unfair and deceptive trade practices are not assignable. BCBS-NC's motion to dismiss Count 12 is granted. There is no need to address its other challenges to Count 12.

J.

In Count 13, Exact alleges unfair and deceptive trade practices resulting from BCBS-NC's violation of the Coverage Mandate and resulting Prompt Pay Act violation. (See Pls.' Br. in Opp'n at 19.) For the same reasons as explained above, (see supra §§ III.B., III.C., III.I.), Exact lacks standing to bring this claim. BCBS-NC's motion to dismiss Count 13 is granted. There is no need to address BCBS-NC's other challenges to Count 13.

K.

In Count 14, Exact alleges a claim for quantum meruit because it "has conferred upon BCBS-NC the benefit of providing treatment to BCBS-NC Subscribers" and "reasonably expected remuneration from BCBS-NC in the form of its full billed charges minus any applicable patient responsibilities." (Am. Compl. ¶¶ 232, 233.) "By refusing to pay Exact for the treatment that Exact provided to BCBS-NC, BCBS-NC has been unjustly enriched." (Id. ¶ 234.)

"Quantum meruit a measure of recovery for the reasonable value of services rendered in order to prevent unjust enrichment." Whitfield v. Gilchrist, 497 S.E.2d 412, 414 (N.C. 1998). However, it "does not apply where no benefit accrues to the party from whom compensation is sought." Wing v. Town of Landis, 599

37

S.E.2d 431, 433 (N.C. Ct. App. 2004).  Such is the case here.  BCBS-NC did not receive services from Exact such that it was unjustly enriched.  Exact does not even allege as much.  Instead, as it must, it alleges that it provided treatment to BCBS-NC Subscribers, but that does not lead to the conclusion that Exact conferred a benefit upon BCBS-NC for having done so.  As such, quantum meruit is not applicable to the facts as alleged in the Amended Complaint.  BCBS-NC's motion to dismiss Count 14 is granted.  There is no need to discuss BCBS-NC's other challenges to Count 14.

IV.

In sum, BCBS-NC's motion to dismiss is granted as to Counts 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, and 14.  It is denied as to Counts 1, 3, and 7.

V.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendant Blue Cross and Blue Shield of North Carolina's Motion to Dismiss [Doc. #21] be GRANTED IN PART AND DENIED IN PART.  It is GRANTED as to Counts 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, and 14.  It is DENIED as to Counts 1, 3, and 7.

This the 27th day of March, 2017.


/s/ N. Carlton Tilley, Jr.
Senior United States District Judge